**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| NICE PEOPLE AT WORK, INC., | Civil Action No.: 21-cv-_19____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| MATT STERNBERG, | |
| Defendant. | |

Plaintiff, Nice People at Work, Inc. ("NPAW" or "Plaintiff"), by its undersigned attorneys, alleges as follows:

### Nature of the Action

1.     In violation of his Employment Agreement with NPAW, as well as the common law duties he owes to NPAW, defendant Matt Sternberg ("Sternberg") resigned as the Regional Sales Director, North America, New Zealand, the United Kingdom & Ireland of NPAW to immediately become a Director of Sales at one of NPAW's direct competitors, Bitmovin, Inc.

2.     During his almost two-year tenure with NPAW, Sternberg was a high ranking employee with significant responsibilities for sales, marketing and strategic decisions.

3.     As part of his job responsibilities with NPAW, Sternberg was entrusted with some of NPAW's most competitively sensitive strategic trade secrets, including customer lists, pricing strategies, product development and marketing analysis.

4.     During Sternberg's last week of work for NPAW, Sternberg sent from his NPAW email account to his personal email account six emails in rapid succession that contained contact information for NPAW's key customers.    Additionally, Sternberg

{00047283}                                    1

forwarded to his personal email attachments containing a proprietary Power Point presentation developed by NPAW regarding its YOUBORA product, a Power Point document identifying contact persons at a key NPAW customer, a "Master Agreement" between NPAW and a key customer, a pricing quotation for the YOUBORA product offered to a key customer of NPAW, and an informational request from a prospective customer of NPAW.

5.     Sternberg's aforementioned malfeasance was discovered after he had separated from NPAW's employ.

6.     Sternberg immediately thereafter went to work for one of NPAW's direct competitors, and in the same market he worked while employed by NPAW.

7.     Sternberg now works for one of NPAW's direct competitors armed with the confidential trade secrets he emailed himself after announcing his resignation from NPAW, and with approximately two years' worth of NPAW's trade secrets and other confidential information he acquired during his tenure with NPAW.

8.     Sternberg is violating the noncompete provisions of his Employment Agreement with NPAW by working for one of NPAW's direct competitors, Bitmovin, where he cannot avoid exploiting NPAW client relationships developed while employed by NPAW and for NPAW's exclusive benefit, and using his knowledge of NPAW's confidential information to compete against NPAW.

9.     Sternberg is also violating the confidentiality provisions of his Employment Agreement, in which he acknowledged that "any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, [and] would cause irreparable injury to Employer."

10.     To prevent precisely the harm being suffered by NPAW, Sternberg agreed that

he would not leave NPAW to work for a competitor in the same market in which NPAW operates its business without waiting at least 12 months.

11.     NPAW brings this action to enforce Sternberg's Employment Agreement, and seeks injunctive relief to prohibit Sternberg from continuing to breach his Employment Agreement and from the threat of Sternberg using NPAW's trade secrets to the detriment of NPAW.

12.     NPAW's business information is very valuable and maintained with secrecy. Information about NPAW's pricing, discounting, marketing and sales strategy including market timing, and customer lists, is closely guarded, confidential business information that could not be ascertained permissibly by NPAW's competitors. Such information is extremely valuable to NPAW and derives independent value from not being generally known. Disclosure of this information would provide economic value to others.

13.     NPAW takes reasonable steps to protect its confidential and proprietary information, including but not limited to its trade secrets and customer lists. One such step is to have certain of its employees execute confidentiality and restrictive covenant agreements, such as the Employment Agreement executed by Sternberg.

14.     Given his wealth of knowledge about NPAW's pricing, discounting, marketing and sales strategy including market timing, and customer lists, Sternberg poses a real and immediate threat to NPAW.

15.     In order to perform his new job with NPAW's competitor, it is inevitable that Sternberg will use and rely upon NPAW's confidential information and customer relationships to the direct detriment of NPAW and for the benefit of himself and his new employer.

16.     When Sternberg accepted the job responsibilities offered and afforded to him by NPAW, he promised not to take a competitive position for 12 months after leaving NPAW's employ.

17.     He was trusted to keep that promise and was well-compensated in exchange for keeping that promise and for being permitted to access and use NPAW's trade secrets for NPAW's business purposes only.

18.     Sternberg should be ordered to comply with his noncompetition agreement and enjoined from continuing to work for Bitmovin for a period of 12 months beginning from the day he is so enjoined.

19.     Sternberg should also be ordered to comply with the confidentiality provisions of his Employment Agreement and thus prohibited from utilizing NPAW's confidential information in any manner.

## Parties

20.     Nice People at Work, Inc. is a Delaware corporation with its principal place of business at 79 Madison Avenue, New York, New York.

21.     Sternberg is an individual and a former employee of NPAW who resides in the State of New Jersey and who at all times relevant hereto transacted business within the State of New York.

## Jurisdiction and Venue

22.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

23.     The Court has subject matter jurisdiction under 18 U.S.C. § 1331 because this

matter arises under the laws of the United States, including the Defend Trade Secrets Act.

24.     The Court has personal jurisdiction over Sternberg because at all times relevant hereto he transacted business within the State of New York and the claims set forth herein arise out of said business activity.  Sternberg also agreed in his Employment Agreement that New York law would be applied to govern and construe the terms of said agreement.

25.     Venue properly lies in this court because pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3).

## Facts Common to All Counts

26.     NPAW is a business intelligence company which operates in the online media analytics industry.  NPAW maintains physical offices in Barcelona and New York and serves customers globally.

27.     NPAW's flagship product is the YOUBORA Suite, which leverages artificial intelligence and big data to assist Over the Top (OTT) video service operators, broadcasters, telecommunication companies and other online media services to support decision making and actionability across their entire service platforms to build personalized experiences and to maximize revenue.

28.     The online media analytics industry is a narrow niche of the much larger video streaming technology industry.  The video streaming technology industry includes many thousands of companies supporting – for example – video technology infrastructure, content distribution networks, digital rights management, content protection, middleware, hardware, etc.

29.     While the video streaming technology industry has many diverse participants, there are only a handful of companies that compete in the online media analytics industry,

including NPAW.   Currently, NPAW competes mainly with the following companies: (1) Bitmovin; (2) Conviva; (3) Mux; (4) Agama; (5) MediaMelon; and (6) Datazoom.

30.     Those companies control the majority of the media analytics market and compete regularly for the same customers and clients.

**Defendant Sternberg Enters into an Employment Contract Containing Post-Employment Restrictive Covenants.**

31.     On October 10, 2018, NPAW hired defendant Sternberg as Regional Sales Director for North America, Australia, New Zealand, the United Kingdom and Ireland.

32.     The Regional Sales Director position is an executive level position with significant responsibilities for sales, marketing and strategic decisions.

33.     Sternberg's office was located at NPAW's New York City office which is located at 79 Madison Avenue, New York, New York 10016, from where he could transact NPAW's business from his computer across the multiple continents and territories for which he had primary responsibility as Regional Sales Director.

34.     Prior to being hired by NPAW, Sternberg had worked as a consultant within the video streaming technology industry for fifteen (15) years serving a wide variety of businesses. Sternberg had limited experience in the analytics sub-industry and had never worked for any of NPAW's direct competitors.

35.     It was expected that in the course of his job responsibilities Sternberg would be provided access to extensive confidential and strategically sensitive material developed by NPAW, including customer lists, pricing strategies, product development, market analysis, etc.

36.     Accordingly, Sternberg was required to sign an Employment Agreement as a condition of beginning his employment with NPAW, which precludes Sternberg from disclosing

and misusing confidential information of NPAW and which precludes Sternberg from competing with NPAW for one (1) year following the separation of his employment.

**The Relevant Provisions of the Employment Agreement are Clear and Binding.**

37.     The Employment Agreement includes the following provisions that limit Sternberg's ability to misuse confidential information and/or compete with NPAW upon the separation of his employment.

38.     The Employment Agreement provides at Paragraph 18 as follows:

**Non-Competition**

18. The Employee agrees that during the Employee's term of active employment with the Employer and for a period of twelve (12) months after the end of that term, the Employee will not, directly or indirectly, as employee, owner, sole proprietor, partner, director, member, consultant, agent, founder, co-venturer or otherwise, solely or jointly with others engage in any business that is in competition with the business of the Employer within any geographic area in which the Employer conducts its business, or give advice or lend credit, money or the Employee's reputation to any person or business entity engaged in a competing business in any geographic area in which the Employer conducts its business.

39.     The Employment Agreement provides at Paragraph 21:

**Non-Solicitation**
21.  During the term of the Employee's active employment with the Employer, and for while employed thereafter, the Employee will not divert or attempt to divert from the Employer any business the Employer had enjoyed, solicited, or attempted to solicit, from its customers, prior to termination or expiration, as the case may be, of the Employee's employment with the Employer.

40.     At Paragraphs 19 and 20, the Employment Agreement prohibits solicitation of NPAW's employees and contractors.

41.     The Employment Agreement provides at Paragraphs 22 and 23:

**Confidential Information**

22. The Employee acknowledges, that in any position Employee may hold, in and as a result of the Employee's employment the Employer, the Employee will, or may, be making use of, acquiring or adding to information which confidential to the Employer (the "Confidential Information") and the Confidential Information is the exclusive property of the Employer.

23. The Confidential Information will include all data and information relating to the business and management of the Employer, including but not limited to, proprietary and trade secret technology and accounting records to which access is obtained by the Employee, including Work Product, Computer Software, Other Proprietary Data, Business Operations, Marketing and Development Operations, and Customer Information.

42.     The Employment Agreement provides at Paragraphs 27 to 29:

**Obligations Concerning Confidential Information**

27. The Employee agrees that a material term of the Employee's contract with the Employer is to keep all Confidential Information absolutely confidential and protect its release from the public. The Employee agrees not to divulge, reveal, report or use, for any purpose, any of the Confidential Information which the Employee has obtained or which was disclosed to the Employee by the Employer as a result of the Employee's employment by the Employer.

28. The Employee agrees and acknowledges that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages, would cause irreparable injury to Employer, would gravely affect the effective and successful conduct of the Employer's business and goodwill, and would be a material breach of this Agreement.

29. The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Employee in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement and will continue for maximum lawful duration from the date of such expiration or termination.

43.     The Employment Agreement provides at Paragraph 36:

**Remedies**

36. In the event of a breach or threatened breach by the Employee of any

of the provisions of this Agreement, the Employee agrees that the Employer is entitled to a permanent injunction, in addition to and not in limitation of any other rights and remedies available to the Employer at law or in equity, in order to prevent or restrain any such breach by the Employee or by the Employee's partners, agents, representatives, servants, employees, and/or any and all persons directly or indirectly acting for or with the Employee.

44.     The Employment Agreement provides at Paragraph 40 that "[t]his Agreement will be construed in accordance with and governed by the laws of the state of New York."

## Sternberg is Provided Extensive Access to Commercially Sensitive and Confidential Information

45.     As Regional Sales Director, Sternberg was provided access to NPAW's trade secrets, including extensive confidential and competitively sensitive business information of NPAW which is governed by the Employment Agreement.

46.     As Regional Sales Director, Sternberg was provided confidential information regarding the identity and contract terms for NPAW's existing customers.  Specifically, Sternberg was provided information about which of NPAW's current contracts are due to expire within the next year and the substantive and pricing terms of those contracts.  While employed at NPAW, this confidential information allowed Sternberg to open renewal negotiations at the opportune time (in the business quarters leading up to the contract expiration) and to appropriately price the renewal proposal.  In the hands of a competitor, this information would allow NPAW's customer relationships to be poached when they are most vulnerable and allow NPAW to be undercut in the negotiations.

47.     As Regional Sales Director, Sternberg was also provided access to confidential pricing tables and discount strategies developed by NPAW.  Pricing and discounting play a significant role in contract negotiations in the online media analytics industry.  The pricing and discounting materials provided to Sternberg were developed by NPAW at a significant

investment of time and resources and are among NPAW's trade secrets.  In the hands of a competitor, that information would allow NPAW to be undercut and outmaneuvered in negotiations and/or allow a competitor to steal NPAW's market research for its own benefit.

48.     As Regional Sales Director, Sternberg was provided access to NPAW's product development and release strategy, including detailed information about the analytics products being developed and launched within the next year to NPAW's customers.  Prior to release, analytics products in development are treated with the highest level of secrecy.  Technology companies rely heavily on product development and competition is often a race to discover new customer needs and how to solve them.  Disclosure of this information to a competitor of NPAW would place NPAW at a significant competitive disadvantage.

49.     As Regional Sales Director, Sternberg was provided access to NPAW's individualized strategy information for key accounts.  This information was provided to Sternberg to allow him to most effectively market to existing and potential customers on behalf of NPAW.  This strategic information was developed by NPAW through a significant investment of time and resources and is treated with the utmost confidentiality.  That secret strategic information would allow a competitor to short-cut NPAW's extensive investment of time and resources and to target NPAW's key existing and prospective customers.

50.     In addition to those categories of confidential information, Sternberg was provided access to NPAW's confidential customer lists, prospective customer lists, internal strategy and executive meetings, mark analysis meetings, and many other confidential and sensitive forms of business information of NPAW.  Any and all of that information is treated confidentially by NPAW because it would be extremely valuable to NPAW's competitors hoping to outbid, outperform and out-negotiate NPAW.

51.     While NPAW employed Sternberg, NPAW made its trade secrets and confidential, proprietary information known to him to enable him to carry out his responsibilities for and on behalf of NPAW.

52.     NPAW took reasonable steps to maintain the confidentiality of its trade secrets, including making certain employees such as Sternberg enter into employment agreements and limiting disclosure of confidential information, as well as protecting such information at its work locations and on its computer systems.

**Sternberg Voluntary Resigns and Accepts a Position with NPAW's Direct Competitor.**

53.     Sternberg operated as NPAW's Regional Director of Sales from October 2018 to September 2020.  Sternberg provided one (1) week notice to NPAW that he was voluntarily resigning his employment effective September 11, 2020.

54.     As discussed above, defendant Sternberg's current employer, Bitmovin, is one of only a few companies that competes with NPAW within the online media analytics industry. Based on Sternberg's credentials and experience, there were literally thousands of companies within the broader streaming video technology industry where he could have accepted employment without competing with NPAW.  However, Sternberg elected to go to NPAW's direct competitor.  Thus, Sternberg made a voluntary decision to breach the non-compete provisions of his Employment Agreement.

55.     NPAW has subsequently learned that Sternberg accepted a position as Bitmovin's Director of Sales, which places him into direct competition with NPAW within the same market where he had been employed by NPAW.  Sternberg's employment with Bitmovin provides him every opportunity and incentive to leverage the confidential business information he

obtained while employed by NPAW to compete unfairly for his new employer as prohibited by his Employment Agreement.

56.     NPAW has demanded that Sternberg resign his position with Bitmovin based on the clear, unequivocal terms of Sternberg's Employment Agreement.

57.     Defendant Sternberg has refused to comply with Bitmovin's demand that Sternberg honor the terms of his Employment Agreement.

**Sternberg Misappropriates NPAW Documents**

58.     Prior to his voluntary resignation, Sternberg forwarded from his company email account to his personal email account numerous communications and documents which contain NPAW's customer contact and proprietary sales information.

59.     To be clear, Sternberg had access to his company email account 24/7 while employed by NPAW and there is no legitimate reason why he would have forwarded *any* work emails to his private account.   Nevertheless, NPAW has identified nineteen (19) emails containing confidential information and attachments, which Sternberg forwarded from his company email account to his private email account.   Six (6) of those emails were sent in rapid succession on September 8, 2020 – during Sternberg's final week at work with NPAW and after he had accepted a position with Bitmovin.

60.     By way of summary, Sternberg forwarded to his private email account messages containing contact information for NPAW's key customers.   Additionally, Sternberg forwarded attachments containing a proprietary Power Point presentation developed by NPAW regarding its YOUBORA product, a Power Point document identifying contact persons at a key NPAW customer, a "Master Agreement" between NPAW and a key customer, a pricing quotation for the

YOUBORA product offered to a key customer of NPAW, and an informational request from a prospective customer of NPAW.

61.     It is not currently known to NPAW when Sternberg began negotiations with Bitmovin or what promises he made (implicitly or explicitly) to leverage or disclose NPAW's confidential information for his and Bitmovin's benefit in the course of his employment with Bitmovin.  It is not known how much of a premium Sternberg received in his compensation in exchange for his ability and willingness to disclose NPAW's confidential and proprietary information.

62.     However, the email record evidences Sternberg's efforts to take NPAW's confidential information as he was leaving the company which is consistent with an intent to disclose and/or misuse that information in his future employment.  It is unknown, but suspected, that Sternberg took additional documents from NPAW through a thumb drive download or in hardcopy.  NPAW is not able to determine that information at this time without discovery from Sternberg and/or Bitmovin.

**NPAW Faces Existential Harm from Sternberg's Breach of his Restrictive Covenants**

63.     Given his position with a direct competitor in the same market, NPAW reasonably believes that Sternberg has disclosed, used or will disclose and use, NPAW's confidential information for his and Bitmovin's benefit and NPAW's competitive disadvantage. Such use and disclosure is inevitable.  Such improper conduct by Sternberg would allow Sternberg and Bitmovin to target specific NPAW clients and potential clients to purchase services from Bitmovin, instead of NPAW, in direct violation of Sternberg's Employment Agreement.

64.     Sternberg's conduct and actions are clearly calculated to unfairly and impermissibly harm NPAW's business through his breach of contract, the loss of clients and the loss of its goodwill and competitive advantage.

65.     Unless enjoined from doing so, Sternberg will continue to breach the Employment Agreement through his work at Bivmovin, his actual or anticipated solicitation of Bivmovin's clients and employees, and his misuse and/or inevitable future misuse of NPAW's trade secrets.

66.     The confidential, proprietary trade secrets to which Sternberg had access during his employment with NPAW, along with the confidential NPAW information he forwarded to his personal email account, has and will continue to directly aid his employment with one of NPAW's direct competitors, Bitmovin, at great harm to NPAW.

67.     As a direct result of Sternberg's actions, NPAW is reasonably likely to lose its clients and prospective clients, along with its employees, confidential, proprietary trade secrets, and goodwill in an amount that cannot be readily ascertained.

68.     NPAW also faces a significant risk that Sternberg will unlawfully use its confidential, proprietary trade secrets to NPAW's competitive disadvantage.

69.     Since retaining Sternberg in 2018, NPAW has entrusted him with its customer relationships and its most sensitive and confidential strategic information.  Sternberg leaving NPAW as its Regional Sales Director for North America, Australia, New Zealand, the United Kingdom and Ireland to go immediatley work for one of NPAW's direct competitors, Bitmovin, poses an existential threat to NPAW's business.

## FIRST COUNT
## BREACH OF EMPLOYMENT AGREEMENT

70.     Plaintiff repeats and realleges the allegations set forth in the prior paragraphs

in this Complaint as if fully set forth herein.

71.     The Employment Agreement is an enforceable contract that imposes affirmative obligations upon Sternberg.

72.     NPAW has complied with its obligations under the Employment Agreement.

73.     Sternberg has breached the terms of the Employment Agreement by among other actions resigning from NPAW in September 2020 and immediately thereafter going to work for one of NPAW's competitors in the geographic market in which NPAW conducts business and without waiting for the expiration of the one-year non-compete period to which Sternberg expressly agreed.

74.     Sternberg agreed in the Employment Agreement that if he breached, or there was any threat of him breaching, any provision contained therein, then NPAW is entitled to a permanent injunction.

75.     In addition, it is irrefutable that Sternberg emailed NPAW's confidential and proprietary trade secrets and information to himself at his personal email address numerous times over the course of his two year employment with NPAW, including but not limited to six separate times after Sternberg announced his resignation from NPAW and on the eve of him going to work for one of NPAW's direct competitors.

76.     Sternberg expressly agreed in his Employment Agreement that any disclosure of NPAW's confidential information in breach of said agreement cannot be reasonably or adequately compensated for in money damages, would gravely affect the effective and successful conduct of the NPAW's business and goodwill, and would be a material breach of the Employment Agreement.

77.     Given the similarity of Sternberg's positions with NPAW and Bitmovin, and

the fact that the two companies are direct competitors in a small marketplace, Sternberg has and will inevitably (if inadvertently) make use of and/or disclose NPAW's trade secrets and other confidential and proprietary information in performing his job at Bitmovin.

78.     NPAW will also be harmed if Sternberg violates the non-solicitation covenants in the Employment Agreement.

79.     NPAW has no adequate remedy at law for Sternberg's actions, as the irreparable harm that NPAW has suffered and will continue to suffer in connection with Sternberg's breach of his Employment Agreement, including but not limited to by his divulgence of confidential information and trade secrets, as well as NPAW's loss of goodwill, are incapable of quantification.

80.     Unless restrained preliminarily and permanently, Sternberg will continue to violate NPAW's rights by continuing his wrongful conduct, and as such, NPAW will continue to suffer irreparable harm.

81.     Under the circumstances, NPAW is entitled to preliminary and permanent injunctive relief to prevent such irreparable injury, along with damages, including, compensatory and consequential damages, interest, costs and attorneys' fees.

**SECOND COUNT**
**BREACH OF FIDUCIARY DUTY**

82.     Plaintiff repeats and realleges the allegations set forth in the prior paragraphs in this Complaint as if fully set forth herein.

83.     As an employee of NPAW, Sternberg owed his employer an undivided duty of loyalty including but not limited to the duty to advance the interests of NPAW, and the duty to protect NPAW's confidential information from release.

84.     While employed by NPAW, Sternberg was entrusted with cultivating and

developing NPAW's valuable client relationships, and as a result, had access to highly competitive information and trade secrets.

85.     Following his separation from NPAW, Sternberg continues to owe a duty to NPAW to ensure and protect the confidentiality of NPAW's confidential information.

86.     Sternberg breached the duty of loyalty owed to NPAW through his inevitable use and/or disclosure of NPAW's confidential information, and his work for a direct competitor in the same geographic market in which NPAW conducts business.

87.     Sternberg's breach of his duty of loyalty owed to NPAW is causing NPAW to suffer economic loss and damages.

88.     As a proximate cause of Sternberg's violations of his fiduciary duty, NPAW has been and continues to be irreparably harmed and injured.

89.     Sternberg expressly agreed in his Employment Agreement that any disclosure of NPAW's confidential information in breach of said agreement cannot be reasonably or adequately compensated for in money damages, would gravely affect the effective and successful conduct of the NPAW's business and goodwill, and would be a material breach of the Employment Agreement.

90.     NPAW has no adequate remedy at law for Sternberg's actions, as the irreparable harm that NPAW has suffered and will continue to suffer in connection with Sternberg's breach of his duty of loyalty, including but not limited to by his divulgence of confidential information and trade secrets, as well as NPAW's loss of goodwill, is incapable of exact proof.

91.     Unless restrained preliminarily and permanently, Sternberg will continue to violate NPAW's rights by continuing his wrongful conduct, and as such, NPAW will continue

to suffer irreparable harm.

92.     Under the circumstances, NPAW is entitled to preliminary and permanent injunctive relief to prevent such irreparable injury, along with damages, including, compensatory and consequential damages, interest, costs and attorneys' fees.

**THIRD COUNT**
**UNFAIR COMPETITION**

93.     Plaintiff repeats and realleges the allegations set forth in the prior paragraphs in this Complaint as if fully set forth herein.

94.     Sternberg has engaged in unfair competition against NPAW by undertaking actions that are unlawful and unfair as described above.

95.     Sternberg's actions were undertaken with the intent to interfere with and disrupt NPAW's business.

96.     Sternberg's actions are resulting in a competitive advantage to Sternberg and Bitmovin, which advantage was wrongfully obtained.

97.     As a proximate cause of Sternberg's unfair competition, NPAW has been and continues to be irreparably harmed and injured.

98.     NPAW has no adequate remedy at law for Sternberg's actions, as the irreparable harm that NPAW has suffered and will continue to suffer in connection with Sternberg's unfair competition, including but not limited to by his divulgence of confidential information and trade secrets, as well as NPAW's loss of goodwill, is incapable of exact proof.

99.     Unless restrained preliminarily and permanently, Sternberg will continue to violate NPAW's rights by continuing his wrongful conduct, and as such, NPAW will continue to suffer irreparable harm.

100.    Under the circumstances, NPAW is entitled to preliminary and permanent injunctive relief to prevent such irreparable injury, along with damages, including, compensatory and consequential damages, interest, costs and attorneys' fees.

**FOURTH COUNT**
**TRADE SECRET MISAPPROPRIATION**

101.    Plaintiff repeats and realleges the allegations set forth in the prior paragraphs in this Complaint as if fully set forth herein.

102.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1831 et seq., and common law prohibit the acquisition, disclosure, use, conversion and misappropriation of trade secrets and authorize injunctions based on actual or threatened misappropriation.

103.    While NPAW employed Sternberg, NPAW made its trade secrets and confidential, proprietary information known to him to enable him to carry out his responsibilities for and on behalf of NPAW.

104.    NPAW took reasonable steps to maintain the confidentiality of its trade secrets made known to Sternberg, including requiring Sternberg enter into the Employment Agreement that expressly prohibited Sternberg from using such information unless consented to by NPAW.

105.    Sternberg now works for one of NPAW's direct competitors armed with the confidential trade secrets he emailed himself after announcing his resignation from NPAW, and with approximately two years' worth of NPAW's trade secrets and other confidential information he acquired during his tenure with NPAW.

106.    NPAW faces a significant risk that Sternberg has and/or will unlawfully use its confidential, proprietary trade secrets to NPAW's competitive disadvantage, without NPAW's consent, and in fact, in direct contravention of his Employment Agreement and his common law duty not to disclose such information.

107.     NPAW's trade secrets have economic value from not being generally known to, or readily identifiable by proper means by, competitors and other persons who can obtain economic value or from their disclosure or use.  They are unique, not publicly available, not known to or shared with the market, and are extremely valuable, provide numerous competitive advantages in the market, and if disclosed, would enable competitors to unfairly compete by avoiding the substantial efforts NPAW has invested over many years to cultivate and protect these trade secrets, and would undercut NPAW's pricing models, and allow NPAW's competitors to unfairly target its clients.

108.     NPAW has made reasonable and diligent efforts to maintain its trade secrets by storing them in secure databases and programs; limiting access to this information to only those employees who need such information to perform their job function; and requiring as a condition of employment that such information be maintained as confidential.

109.     The Employment Agreement is an enforceable agreement that imposes upon Sternberg contractual obligations including the obligations of nondisclosure of NPAW's confidential information.

110.     Sternberg misappropriated NPAW's trade secrets when he, during his last week of work for NPAW, sent from his NPAW email account to his personal email account six emails in rapid succession that contained contact information for NPAW's key customers.  Additionally, during his two year tenure with NPAW, Sternberg forwarded thirteen other emails containing confidential information and attachments.  This was so despite Sternberg having access to his NPAW email account 24/7 while employed by NPAW.

111.     The timing of Sternberg's conduct shows that it was intentional, in bad faith and with the purpose of enabling him and his new employer to unfairly compete.

112.    If Sternberg continues to work for Bitmovin without waiting the twelve months from his separation from NPAW's employ, he will inevitably, even if inadvertently, use and disclose NPAW's trade secrets for his own benefit and for the benefit of his new employer, Bitmovin.

113.    Given Sternberg's actual or impending misappropriation of NPAW's trade secrets in violation of the DTSA, his common law and contractual duties, NPAW will be damaged.

114.    As a proximate cause of Sternberg's misappropriation, NPAW has been and continues to be irreparably harmed and injured.

115.    NPAW has no adequate remedy at law for Sternberg's actions, as the irreparable harm that NPAW has suffered and will continue to suffer in connection with Sternberg's trade secret misappropriation, including but not limited to by his divulgence of confidential information and trade secrets, as well as NPAW's loss of goodwill, are incapable of exact proof.

116.    Unless restrained preliminarily and permanently, Sternberg will continue to violate NPAW's rights by continuing his wrongful conduct, and as such, NPAW will continue to suffer irreparable harm.

117.    Under the circumstances, NPAW is entitled to preliminary and permanent injunctive relief to prevent such irreparable injury, along with damages, including, compensatory and consequential damages, exemplary damages two times the amount of the damages for Sternberg's willful and malicious misappropriation, interest, costs and attorneys' fees provided for by the DTSA.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff NPAW demands judgment against defendant Matt Sternberg as follows:

{00047283}                                                    21

A. That this Court enter a Temporary Restraining Order, Preliminary and Permanent Injunction restraining and enjoining Sternberg from, directly or indirectly:

    a. engaging in any business association, directly or indirectly, as employee, owner, sole proprietor, partner, director, member, consultant, agent, founder, co-venturer, independent contractor or otherwise, with Bitmovin, Inc. for a period of twelve (12) months from the first date Sternberg is first so enjoined;

    b. directly or indirectly, engaging in any business, as employee, owner, sole proprietor, partner, director, member, consultant, agent, founder, co-venturer, independent contractor or otherwise, that competes with NPAW for a period of twelve (12) months from the first date Sternberg is first so enjoined;

    c. diverting or attempting to divert from NPAW any business that NPAW had enjoyed, solicited, or attempted to solicit, prior to the termination of Sternberg's employment with NPAW for a period of twelve (12) months from the first date Sternberg is first so enjoined;

    d. inducing, soliciting or attempting to induce or solicit any NPAW employee or contractor to leave NPAW's employ for a period of twelve (12) months from the first date Sternberg is first so enjoined; and

    e. disclosing, divulging, revealing, reporting or using, for any purpose, any of NPAW's confidential information or trade secrets which Sternberg obtained or which was disclosed to Sternberg by NPAW as a result of Sternberg's employment by NPAW.

B.  Awarding NPAW monetary damages in the amount of its lost profits, compensatory and consequential damages, including but not limited to exemplary damages permitted by the DTSA, plus interest and costs;

C.  Awarding NPAW its attorneys' fees, costs and disbursements incurred as a result of this action, including but not limited to its attorneys' fees permitted by the DTSA; and

D.  Awarding NPAW such further relief as the Court deems just and proper.

Dated: January 4, 2021                        By:  /s/ Roy J. Thibodaux III
                                                   Roy J. Thibodaux III, Esq.

                                              BERKOWITZ, LICHTSTEIN, KURITSKY,
                                              GIASULLO & GROSS, LLC

                                              104 West 40th Street, Suite 500
                                              New York, New York 10018
                                              Phone: (646) 475-8364

                                              75 Livingston Avenue
                                              Roseland, New Jersey 07068
                                              Phone: (973) 325-7800
                                              Fax: (973) 325-7930
                                              rthibodaux@blkgg.com

                                              Attorneys for Plaintiff,
                                              Nice People at Work, Inc.